# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| AMERICAN MARRIAGE MINISTRIES, | ) | |
| | ) | Case No. 3:24-cv-247 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Debra C. Poplin |
| CHERYL COLLINS, *et al*., | ) | |
| | ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION

Before the Court are cross-motions for summary judgment filed by Plaintiff American Marriage Ministries (Doc. 49) and Defendants Jennings Jones and Coty Wamp (together, "Defendants") (Doc. 47).[1]  For the following reasons, the Court will **GRANT** Defendants' motion for summary judgment and **DENY** Plaintiff's motion.

## I.    BACKGROUND

### A.    The *ULCM* Litigation

This dispute exists in the shadow of previous litigation, *Universal Life Church Monastery Storehouse v. Nabors* (hereinafter, *ULCM*), which concerned a 2019 amendment to a Tennessee law that regulates who may solemnize marriages.  35 F.4th 1021 (6th Cir. 2022); Tenn. Code Ann. § 36-3-301.  That amendment (the "Online Ordination Ban") provided that "[p]ersons receiving online ordinations may not solemnize the rite of matrimony."  Tenn. Code Ann. § 36-

---

[1] The clerk has entered default against the other defendant remaining in this litigation, Cheryl Collins (Doc. 32).

3-301(a)(2).  The Online Ordination Ban became effective on the same day as an amendment to Tennessee Code Annotated § 39-16-504(a)(1) (the "false-statement statute"), which criminalizes "mak[ing] a false entry in . . . a government record," that heightened the offense level to a Class E felony.  As the Sixth Circuit explained in *ULCM*, it is plausible that the timing of these two amendments was intentional:

> It works like this:  Ministers completing a marriage license must attest that they have "solemnized the rite of matrimony between the" now-married couple.  But making a false statement on the license—for instance, by claiming to have solemnized a marriage despite knowingly lacking the requisite authority—may be construed as making a false entry in a government record.

35 F.4th at 1028 (cleaned up) (citing Tenn. Code Ann. § 36-3-304 (governing the form of a marriage certificate, which must be "signed by the person solemnizing the marriage" and delivered to a county clerk)).

The Universal Life Church Monastery Storehouse ("ULCM") is a nonprofit corporation that performs online ordinations, ordaining as a minister "anyone who completes a simple, online form."  *ULCM*, 35 F.4th at 1026.  Following the 2019 amendments, ULCM—along with some of its ministers and couples wishing to be married by them—brought suit under 42 U.S.C. § 1983 in the Middle District of Tennessee against a group of state officials in their official capacities including the governor, the state attorney general, multiple district attorneys general, and multiple county clerks.  *See id.* at 1028.  The *ULCM* plaintiffs alleged multiple federal and state constitutional violations, including on Equal Protection, Free Exercise, Establishment, and Free Speech grounds.  *See id.*

The *ULCM* defendants moved to dismiss for lack of subject-matter jurisdiction on standing and sovereign-immunity grounds, and the Middle District granted this motion in part and denied it in part.  *See id.* at 1029–30.  The defendants then filed an interlocutory appeal to

the Sixth Circuit, arguing that the plaintiffs lacked standing because the Online Ordination Ban has no enforcement mechanism and, relatedly, that the plaintiffs' claims were barred by sovereign immunity because they "either have not threated enforcement of, or lack an enforcement connection to, the contested laws." *Id.* at 1030. The Sixth Circuit affirmed in part and reversed in part, leaving remaining claims against three district attorneys general and one county clerk, and remanded to the Middle District. *See id.* at 1042.

After remand, *ULCM* was resolved when the remaining parties agreed to dismiss based on a set of stipulations, dated August 28, 2023, and the Middle District so ordered the case dismissed the following day. (*See* Case. No. 2:19-cv-49 (M.D. Tenn.), Docs. 340–41 (stipulations), 342–43 (dismissal orders).) Specifically relevant to the instant case are the stipulations that facilitated dismissal against the district attorneys general (the "ULCM Stipulations"); these provide, in full, as follows:

1. On June 21, 2019, Plaintiffs filed this lawsuit, challenging the constitutionality of Tenn. Code Ann. § 36-3-301. Plaintiffs contend that they could be prosecuted under Tenn. Code Ann. § 39-16-504 because they make a false statement when they make the attestation required by Tenn. Code Ann. § 36-3-304. Defendants contend that Plaintiffs do not have standing to challenge the statute because there is no credible threat of prosecution.

2. Defendants stipulate and represent that it has always been their position that there is no criminal prosecution mechanism in Tenn. Code Ann. § 36-3-301 and thus Plaintiffs cannot be prosecuted under that statute.

3. In addition, Defendants stipulate and represent that it has always been their position that notwithstanding Tenn. Code Ann. § 36-3-301, by simply making the attestation required by Tenn. Code Ann. § 36-3-304, Plaintiffs are not making a false statement and thus there is no prosecutable offense under Tenn. Code Ann. § 39-16-504.

4. Defendants also stipulate and represent that it has always been their position that they are not involved with the issue of whether any marriage is valid and Defendants will not challenge the validity of marriages officiated or solemnized by ULCM ministers.

3

5. Defendants acknowledge that Plaintiffs ULCM and its ministers, including Gabriel Biser and Erin Patterson, intend to solemnize weddings in Defendants' respective counties in reliance on these stipulations.

(Doc. 49-1, at 349.[2])

On August 30, 2023, ULCM published a press release on *PRWeb*, "Universal Life Church Wins Settlement in Lawsuit Against Tennessee," summarizing the litigation and celebrating its "victory." (*Id.* at 68–69.) The press release described the ULCM Stipulations as follows:

The orders include a pledge from Tennessee Officials that they will never prosecute a Universal Life Church minister for solemnizing a wedding, and an acknowledgement that denying marriage licenses to couples married by a ULC minister could be a constitutional violation on their part. The Tennessee officials also acknowledge that ULC ministers will rely on the court order to solemnize weddings in the future.

(*Id.* at 68.) The record also includes screenshots of ULCM's website and other online sources making similar statements about ULCM's success. (*See id.* at 70–72.) ULCM's website contains the following "Important Notice":

As you may be aware, in 2019, the state of Tennessee tried to pass a law that would bar ministers who were ordained online from solemnizing weddings. We challenged this anti-ULC law in federal court, and after a four-year legal battle, in 2023, the ULC secured assurances that its ministers' rights to officiate wedding ceremonies in Tennessee will be respected moving forward.

(*Id.* at 72.) A page on "GetOrdained.org" titled "How to Become a Wedding Officiant in Tennessee" likewise exhibits an "Important Notice" with substantially the same language.[3] (*Id.* at 70.)

---

[2] This citation, which the Court will use going forward, is to the copy of the ULCM Stipulations that appears in the summary-judgment record in the instant case. It is identical to the filing that appears on the original docket in the Middle District. (*See* Case No. 2:19-cv-49, Doc. 340.)

[3] It is not clear from the record whether this website is affiliated with ULCM.

**B.      The Present Dispute**

Plaintiff American Marriage Ministries ("AMM") is a non-denominational church that, as "[a] primary part of [its] ministry," ordains ministers. (Doc. 50, at 2; *see* Doc. 49-1, at 464–65.) AMM believes marriage is a "sacred union" and the "natural right of all people, regardless of race, sexual identity, nationality, socioeconomic status, or religious background." (*Id.* at 473.) It believes every couple has the "right to enter into the institution of marriage on their own terms, which includes the right to choose who performs their wedding ceremony." (*Id.* at 469.) According to Executive Director Lewis King,

> In order to facilitate the right of each couple to choose who performs their wedding ceremony, AMM performs ordination services for free, and it makes these services available online. AMM additionally provides advocacy and training to its ministers in furtherance of its belief that all people have the right to get married and to perform marriage.

(*Id.* at 465.) To date, according to King, AMM has ordained over 1,490,000 ministers nationwide, and approximately 30,000 of those ministers reside in Tennessee. (*See id.*) Though AMM primarily provides ordination services online, it has also offered in-person ordination services, including in Tennessee; "AMM does not track whether a minister was ordained in person or online, and it does not differentiate in any way between ministers ordained in person or online." (*Id.*)

AMM states, and Defendants do not dispute, that enforcement of the Online Ordination Ban by Tennessee officials has been inconsistent since it was enacted: "Some of AMM's ministers have been able to solemnize marriages in Tennessee without incident, but other AMM ministers, and couples seeking to be wed by AMM ministers, have been told by county clerks that an AMM-ordained minister cannot validly solemnize marriage in Tennessee." (Doc. 50, at

5

3–4.)  The factual record contains documentation of numerous incidents in which AMM ministers or the couples seeking to be married by them were told by county clerks that AMM-online-ordained ministers could not solemnize marriages[4]:  For instance, in an email dated October 13, 2023, an AMM employee reported to Executive Director King, "someone called in and said that they were married by someone from [AMM] . . . last Saturday.  They received a call from a county clerk saying that they are denying the marriage license."  (Doc. 49-1, at 15.)  On June 22, 2024, AMM received an email stating, "Tennessee is no longer accepting weddings officiated from an online ordination.  The website says they do but the court house says they won't."  (*Id.* at 34.)  Another minister emailed AMM on January 5, 2024, stating, "I just purchased my ordination and prepared the ceremony I had planned for my friends that asked me to wed them.  . . .  I called the Shelby County Clerk today and they informed me they do not recognize online ordainment."  (*Id.* at 46.)  Another document, described as a "Log of Phone Calls Received by AMM," contains notations from throughout 2024 such as the following: "County told couple that they would not accept an online ordained Minister and would not process the marriage license"; "Benton county clerks told them that the attorney general told them online ordination is not valid and acceptable"; "Davidson County in Nashville laughed at her about being ordained online and said it was illegal . . . do her research"; "Minister told couple that county said online ordination was not valid, will end up doing in Kentucky instead"; and, repeated in multiple log entries, "County told couple that they would not accept an online ordained Minister."  (*Id.* at 67.)

---

[4] Defendants do not dispute that the following incidents occurred as documented in the records submitted by AMM.

AMM has also received many emails from ministers, prospective ministers, and couples inquiring about the efficacy of its online-ordination services; the record includes a 60-page compilation of such emails, most of which postdate the entry of the ULCM Stipulations. (*Id.* at 16–66.) Many of these email inquiries express general confusion or uncertainty about the legal status of online ordination, and thus AMM's services, in Tennessee:

- "I am interested in getting ordained but unfortunately I am being told two different things. If I get ordained, will I be able to marry a couple in the state of TN and it be legal?" (*Id.* at 22.)

- "I want to use American Marriage Ministries to get ordained and perform the ceremony, but I am concerned about the state's prohibition on ministers ordained online per Tennessee Code 36-3-301." (*Id.* at 26.)

- "My question is this: AM I STILL GOOD TO OFFICIATE A WEDDING IN TENNESSEE WITH MY AMERICAN MARRIAGE MINISTRIES ORDAINMENT?" (*Id.* at 27 (emphasis in original).)

- "I am an ordained minister with the AMM. I recently moved to Knoxville, TN and have heard there is some controversy around the acceptance by the Tennessee government relating to online ordination and solemnizing a marriage. Can you enlighten me about this? . . . I do not want to market myself and do wedding ceremony only to not be able to solemnize the marriage legally as this will harm my reputation as a [m]inister." (*Id.* at 51.)

Several go further and express frustration or dissatisfaction with AMM:

- "I just signed up and paid for an online ordination. However after doing some research, I found out I cannot use your credentials to perform weddings in TN." (*Id.* at 42.)

- "I did this [online ordination through AMM] so I can marry my son however it will be useless as it is not legal in TN. How can this be advertised and promoted but it is false and misleading? Thus fraud seems to be the answer." (*Id.* at 43.)

- "I live in [T]ennessee and my online ordination is not valid to be able to perform any marriages, [I] would like a full refund for false advertising thank you." (*Id.* at 45.)

- "My question: in light of the language of [the Online Ordination Ban], why is AMM claiming that it is legal to be ordained online for the purposes of performing marriage rites in Tennessee?" (*Id.* at 50.)

7

Finally, some inquires refer specifically to the *ULCM* litigation and ask about its implications for AMM's services:

- "From what I have been able to find, ULC won the lawsuit and their ministers with online ordination are legally allows to practice in Tn, but it mentions that the ruling specifies ULC ministers and does not pertain to anyone ordained online through any other churches that provide online ordination. Can you please elaborate on this, more specifically as to whether or not ministers ordained online through AMM are legal recognized in the state of Tn?" (*Id.* at 18.)

- "I understand that ULC won their lawsuit against Tennessee and their online-ordained ministers can now legally solemnize[e] marriages in the state. I also understand, however, that the law applies only to their organization, specifically." (*Id.* at 35.)

According to Executive Director King, AMM has weekly team meetings, and he hears reports from AMM staff about inquires like these emails "[o]n at least a monthly basis." (*Id.* at 465.)

AMM also represents, and Defendants do not dispute, that "in the year following entry of the ULC Stipulation, the number of Tennessee-based ministers that AMM ordained *dropped*, after having steadily increased year-to-year since the pandemic." (Doc. 52, at 5 (emphasis in original); *see also* Doc. 52-1.)

On September 29, 2023, following the entry of the ULCM Stipulations, attorneys representing AMM sent a letter to the Office of the Tennessee Attorney General with the subject line, "Recognition of Online Ordained Ministers after *Universal Life Church Monastery Storehouse v. Nabors et al*." (Doc 49-1, at 13–14.) The letter stated AMM's position that it was similarly situated to UCLM and that, "as the plaintiffs argued in [*ULCM*], we believe this statutory provision [the Online Ordination Ban] is unconstitutional, at least as applied to our client. Moreover, it would be impermissible for the State of Tennessee to treat AMM and its ministers differently—and less favorably—than it now treats ULCMS and its ministers." (*Id.*) The letter then stated AMM "wish[ed] to confirm" that the ULCM Stipulations "apply equally to

any online ordained ministers, including AMM and its ministers, as they do to ULCMS and its ministers," and it specifically asked the Tennessee Attorney General to agree to the following: (a) that online-ordained ministers cannot be prosecuted under the Online Ordination Ban; (b) that online-ordained ministers cannot be prosecuted under the false-statement statute for "simply making the attestation required" to complete a marriage license; (c) that "Tennessee and its respective counties will not challenge the validity of marriages officiated or solemnized by other online ordained ministers, including AMM ministers"; and (d) "that Tennessee county clerks . . . will be trained and directed not to deny, discourage, or chill AMM's religious practice . . . [nor] communicate to members of the public that AMM ministers cannot lawfully solemnize marriages." (*Id.* at 14.)

The Office of the Attorney General did not respond to this letter. On February 7, 2024, AMM sent a letter proposing the same set of stipulations and again received no response. (*See id.* at 94–98.) Defendants represent that they did not agree to AMM's proposed stipulations because they went beyond the ULCM Stipulations and, in any case, exceeded the scope of their official authority. (*See* Doc. 48, at 13–15.) Much later, on April 25, 2025 (during discovery in this litigation), AMM sent another letter proposing Defendants agree to a set of stipulations identical to the ULCM Stipulations—again to no avail. (*See* Doc. 49-1, at 137–41.)

### C. Procedural History

AMM filed its amended complaint on November 12, 2024, naming three different Tennessee district attorneys as defendants: Jennings Jones, as District Attorney General for Rutherford County; Coty Wamp, as District Attorney General for Hamilton County; and Russell Johnson, as District Attorney General for Morgan County. (Doc. 19, at 1, 4.) In its amended complaint, AMM pled eight claims under 42 U.S.C. § 1983, alleging violations of six different

constitutional provisions or doctrines: (1) the Equal Protection Clause; (2) the Free Exercise Clause (and its state constitutional equivalent); (3) the Establishment Clause; (4) the Free Speech Clause (and its state constitutional equivalent); (5) the Due Process Clause, specifically on vagueness grounds; and (6) the unconstitutional-conditions doctrine. (*See id.* at 11–18.)

Jones, Wamp, and Johnson collectively moved to dismiss the amended complaint for lack of subject-matter jurisdiction, arguing AMM lacked standing and that its claims were barred by the doctrine of sovereign immunity. (*See* Doc. 20.) The Court granted in part and denied in part the motion to dismiss. (*See* Doc. 31.) The Court dismissed all claims against Johnson (who was not a party to *ULCM* or the ULCM Stipulations), as well as the following claims against Wamp and Jones: the state constitutional claims, the vagueness claim, and the unconstitutional conditions claim. (*See id.*) However, the Court denied the motion as to the remaining four claims against Wamp and Jones: Establishment, Free Exercise, Free Speech, and Equal Protection. (*See id.*)

On June 16, 2025, AMM and Defendants filed cross motions for summary judgment. (Docs. 47, 49.) Both motions are now ripe for review.

## II.     STANDARD OF LAW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and makes all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

The moving party bears the burden of demonstrating that there is no genuine dispute as to

any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The moving party may meet this burden either by affirmatively producing evidence establishing that there is no genuine issue of material fact or by pointing out the absence of support in the record for the nonmoving party's case. *Celotex*, 477 U.S. at 325. Once the movant has discharged this burden, the nonmoving party can no longer rest upon the allegations in the pleadings; rather, it must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).

At summary judgment, the Court may not weigh the evidence; its role is limited to determining whether the record contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). A mere scintilla of evidence is not enough; the Court must determine whether a fair-minded jury could return a verdict in favor of the non-movant based on the record. *Id.* at 251–52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If not, the Court must grant summary judgment. *Celotex*, 477 U.S. at 323.

III.     ANALYSIS

The parties dispute several issues on summary judgment, including some jurisdictional issues that were raised in Defendants' motion to dismiss.

A.     Standing

Defendants first argue they are entitled to summary judgment because AMM does not have Article III standing. The case-or-controversy requirement of Article III, Section 2, mandates that a plaintiff have standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016)). An injury, for standing purposes, means the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A "concrete" injury in fact does not have to be tangible, but it must be "'real,' and not 'abstract.'" *See id.* at 340.

The plaintiff bears the burden of showing that standing exists. *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 388 (6th Cir. 2016) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan*, 504 U.S. at 561. However, at the summary judgment stage, the plaintiff cannot rely on "mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Id.* (internal citations and quotations omitted).

### i.     *The Court's Standing Analysis on the Motion to Dismiss*

In its order on Defendants' motion to dismiss for lack of subject-matter jurisdiction, the Court determined that AMM plausibly alleged organizational standing on one of three theories it advanced: AMM had not alleged standing based on (1) an imminent threat of criminal prosecution or (2) a diversion of organizational resources, but it did allege standing based on (3) pecuniary and reputational harm. (*See* Doc. 31, at 16–24.) The Court articulated this theory of

standing, on which AMM's claims proceeded to discovery and the present motion, as follows:

AMM's allegations of pecuniary and reputational harm satisfy the injury requirement. *See Daunt*, 956 F.3d at 417. Consider its alleged interests: AMM is a nonprofit religious organization that believes "[i]t is the right of every couple to choose who will solemnize their marriage and that "[a]ll people have the right to solemnize marriage." (Doc. 19, at 3.) "To further its tenets, AMM ordains people as ministers." (*Id.*) In addition, AMM alleges its "ministry includes educating and supporting its ministers on how to perform the sacred rite of matrimony and advocating for religious freedom." (*Id.*) The Court finds these allegations sufficient to show AMM has a pecuniary interest in ordaining ministers, including ministers who solemnize marriages in Tennessee.

AMM further alleges it has "received inquiries from its ministers asking about the status of their ability to preside over weddings in Tennessee and relaying problems and concerns related to the same." (*Id.* at 8.) It seeks to advise those ministers that the marriages they solemnize will be valid and will not subject them to criminal prosecution; however, AMM feels it cannot so assure its ministers at present due to its uncertainty regarding whether the Online Ordination Ban will be enforced against AMM ministers or otherwise invalidate the marriages they perform. (*See id.* at 7–8.) AMM alleges that situations like the incident of a Morgan County clerk temporarily refusing to process a marriage performed by an AMM-ordained minister "cause significant distress to affected AMM ministers and couples reliant on [their] services." (*Id.* at 9.) "Such situations," it alleges, "harm AMM's reputation with ministers, prospective ministers, and couples considering whether to have an AMM minister officiate their wedding ceremony."[5] (*Id.*) Because AMM has a pecuniary interest in ordaining ministers, it also has an interest in being able to give its ministers and prospective ministers some assurance that the marriages they perform will be valid. And given the facts of the ULCM Stipulations and Jones and Wamp's alleged refusal to extend them to AMM—facts that leave AMM to compete with an organization, ULCM, who *can* assure its ministers their marriages will be uncontested because a legally binding stipulation says so—AMM's reticence in advising its ministers goes beyond a mere "setback to [its] abstract social interests." (Doc. 21, at 5 (quoting *Greater Cincinnati Coal. for the Homeless v. City of Cincinnati*, 56 F.3d 710, 716 (6th Cir. 1995).) The Court therefore finds AMM's alleged pecuniary and reputational harm constitutes a "concrete and particularized" injury sufficient to survive dismissal. *Daunt*, 956 F.3d at 417.

As the Supreme Court observed in *Alliance for Hippocratic Medicine*, "[t]he second and third standing requirements—causation and redressability—are often

---

[5] While, as mentioned previously, this alleged incident took place in Morgan County, the Court interprets AMM's allegations as asserting more incidents like it may have taken place in other counties. *See supra* 20 n. 8. For pleading purposes, therefore, the Court finds these allegations sufficiently relevant to the injuries it asserts against Jones and Wamp.

'flip sides of the same coin.' If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." 602 U.S. at 380–81 (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)). AMM contends that, by entering into the ULCM Stipulations and thus "taking a public position as to the validity of weddings officiated by [ULCM] ministers . . . yet refusing to acknowledge any similar stance as to weddings officiated by AMM ministers," Jones and Wamp "have set up favored and disfavored religious institutions under the law" in violation of AMM's constitutional rights. (Doc. 19, at 4.) Essentially, AMM is alleging Jones and Wamp have blessed the activities of one similarly situated religious organization over another, and that this disparate treatment has caused its ministers and prospective ministers—who are functionally its customers—to question whether they can rely on AMM's services. (*See id.* at 4, 8–9.) When those customers have inquired about its ordination services, AMM alleges, it has been unable to represent those services will be effective because of Jones and Wamp's refusal to extend the ULCM Stipulations and, as a result, suffers pecuniary and reputational harm. (*See id.*)

. . . [H]ere, if the Court were to grant some combination of the injunctive relief AMM seeks, AMM would be in a tangibly different position relative to the Online Ordination Ban: it would (like ULCM) have a legally binding order guaranteeing that Jones and Wamp will not challenge AMM-officiated marriages in their jurisdictions, and it would be able to advise its customers accordingly. *Alliance for Hippocratic Medicine*, 602 U.S. at 380–81. Thus, the Court finds AMM has sufficiently alleged that Jones and Wamp's conduct is traceable to its alleged pecuniary and reputational injury, and that the relief it seeks can remedy that injury. *See id.*

(Doc. 31, at 20–24.)

### ii. *Whether AMM Has Established Standing on Summary Judgment*

The Court now finds that this theory of organizational standing based on pecuniary and reputational harm has been borne out by "specific facts" in the summary judgment record. *Lujan*, 504 U.S. at 561. A substantial amount of this evidence consists of email communications between AMM and its ministers, prospective ministers, and couples wishing to be married by them. (*See* Doc. 49-1, at 16–66.) These communications contain multiple examples of AMM's customers expressing doubts about the legal efficacy of its online ordination services (*see id.*, at 22, 26, 27, 51), at times even accusing AMM of "fraud" or "false advertising" (*id.* at 43, 45), all

of which suggest AMM has suffered a pecuniary and reputational injury. Perhaps the most powerful evidence for standing in these communications, though, consists of the inquiries that refer to the ULCM Stipulations, such as this one:

> From what I have been able to find, ULC won the lawsuit and their ministers with online ordination are legally allow[ed] to practice in Tn . . . Can you please elaborate on this, more specifically as to whether or not ministers ordained online through AMM are legal[ly] recognized in the state of Tn?

(*Id.* at 18; *see also id.* at 35.) This email alone demonstrates the three elements required for standing. *See Lujan*, 504 U.S. at 560. First, it demonstrates injury—specifically, a pecuniary and reputational injury—because it is clearly motivated by a suspicion that AMM is offering an *inferior* service, as the writer doubts the legal status and authority of "ministers ordained online through AMM" in comparison to those ordained online by ULCM. (Doc. 49-1, at 18.) Second, traceability is evident in the writer's reference to what he understands as ULCM's privileged status as a result of its having "won [its] lawsuit," suggesting his doubts about AMM's services are causally related to Defendants' conduct in the ULCM Stipulations. (*Id.*) Finally, it suggests AMM's injury would be redressed by a favorable judicial decision, such as an injunction prohibiting disparate treatment of AMM and ULCM, because that would allow AMM to demonstrate to customers like this writer that it enjoys the same legal status and privileges as ULCM. (*See id.*)

These inquiries from customers are not the only evidence in support of AMM's standing. The record reflects that, while the number of ministers AMM ordained online had "steadily increased year-to-year since the pandemic," that number dropped in the year following the entry of the ULCM Stipulations. (Doc. 52, at 5.) This fact, especially when viewed in conjunction with the customer communications discussed above, suggests AMM suffered pecuniary and reputational harm *related* to the ULCM Stipulations and Defendants' subsequent withholding of

similar privileges from AMM.  In other words, the record clearly supports findings that, following the ULCM Stipulations, customers began to express serious doubts about AMM's online ordination services and, consistent with those doubts, began choosing AMM less frequently.  (*See id.*; Doc. 49-1, at 16–66.)[6]

Defendants argue that AMM cannot establish standing because it has not put forth any facts tying the evidence of its alleged pecuniary and reputation harm to the districts in which Defendants serve.  (*See* Doc. 48, at 9–10.)  They cite deposition statements by Executive Director King indicating that AMM does not keep records of various categories of district-specific information, such as the districts in which its ministers reside, whether its ministers have officiated (or plan to officiate) weddings in Defendants' districts, and its revenue by district. (*See id.* (citing Doc. 49-1, at 233–36, 246–47).)  However, this argument confuses the issue because it relies on the logic of pre-enforcement standing based on a threat of criminal prosecution, and the Court already determined in its motion-to-dismiss order that AMM's claims cannot proceed on that basis.  *See McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016) (outlining a four-factor test for whether there is standing based on imminent criminal prosecution); (Doc. 31, at 9–13, 16–18).  There is no evidence here that any AMM minister has ever been prosecuted, or threatened with prosecution, under the Online Ordination Ban.  (*See*

_____

[6] As it turns out, customers' doubts about AMM may have been well-founded, as the record reflects several incidents in which Tennessee county clerks refused to process marriages that would be solemnized by ministers ordained online by AMM or otherwise communicated to couples that AMM-ordained ministers are not acceptable.  (*See* Doc. 49-1, at 15, 34, 46, 67.) However, it is less clear that this evidence supports AMM's standing.  There is no affirmative evidence in the record indicating (a) that any one county clerk refused to process marriage licenses officiated by AMM ministers *while* allowing those with ULCM ministers; or (b) that any one of these county clerks had prior knowledge or the ULCM Stipulations when they refused to process AMM-officiated licenses.  The Court does not rely on this evidence to determine that AMM has standing.

Doc. 49-1, at 236.)  Rather, AMM contends that Defendants' disparate treatment of ULCM and AMM in relation to the statute—separate and apart from the lack of criminal enforcement against ministers ordained from either organization—has caused it to suffer pecuniary and reputational harm in a way that is unrelated to Hamilton or Rutherford County in particular.  (*See generally* Doc. 50.)  For instance, the many emails AMM submitted from concerned or frustrated customers tend to suggest, overwhelmingly, that those ministers and prospective ministers doubted the efficacy of its online-ordination services *in Tennessee generally*.  (*See* Doc. 49-1, at 16–66.)  Thus, AMM's pecuniary and reputational injury, and the standing it confers, does not depend on the district-specific mechanics of criminal prosecution.

The Court must accept the facts put forth by AMM as true for the purposes of evaluating standing on summary judgment, and it finds them sufficient for Article III standing.  *See Lujan*, 504 U.S. at 561.  Finally, because Defendants do not contest the factual accuracy of any of the evidence discussed above, it is unnecessary to reserve resolution of standing for trial.  *See id.*

### iii.    *The Scope of AMM's Standing*

The parties also dispute the scope of the claims that are now pending before the Court on summary judgment.  Specifically, Defendants contend that the Court dismissed "AMM's facial claims" on the motion to dismiss (Doc. 51, at 7), citing this portion of the Court's order:

> Here, the "challenged conduct" on which AMM has established standing against Jones and Wamp is their allegedly disparate enforcement of the Online Ordination Ban with respect to similarly situated religious organizations.  (*See* Doc. 19, at 4.) This conduct sounds clearly in Equal Protection; it sounds in Free Exercise and Establishment because Jones and Wamp have allegedly burdened AMM's right to exercise its religious beliefs and "set up favored and disfavored religious institutions under the law"; and this conduct sounds in Free Speech insofar as it allegedly prevents AMM from engaging in expressive speech or conduct about its beliefs.  (*See id.* at 3–4, 8–11.)  Therefore, AMM has standing to bring its Equal Protection, Free Exercise, Establishment, and Free Speech claims against Jones and Wamp.

However, it is not clear that Jones and Wamp's "challenged conduct" can be construed as violating the Due Process Clause on vagueness grounds or the unconstitutional-conditions doctrine such that violations of those doctrines can be traced to AMM's injury. *Daunt*, 956 F.3d at 417. Vagueness generally suggests a problem with statutory language—as here, where AMM alleges the Online Ordination Ban "fails to inform regulated parties as to what is required of them" because of language like "considered, deliberate, responsible act" and "online ordinations." (Doc. 19, at 18.) But Jones and Wamp's allegedly unconstitutional conduct pertains to their *enforcement* of the statute, not necessarily the statute itself, and the complaint allegations do not explain how the alleged vagueness of the statutory language contributes to AMM's pecuniary and reputational harm.[7] (*See id.* at 17–18; *see generally id.*) For its unconstitutional-conditions claim, AMM alleges the Online Ordination Ban unconstitutionally conditions the rights of ministers and couples on refraining from certain forms of religious exercise. (*See id.* at 18.) But, similar to vagueness, the complaint allegations do not account for how this alleged unconstitutional conditioning corresponds to Jones and Wamp's disparate enforcement of the statute, nor how it is traceable to an injury to AMM itself.[8] (*See generally id.*) Accordingly, the Court finds AMM has not met its burden of demonstrating standing to bring its vagueness and unconstitutional-conditions claims against Jones and Wamp. *See Galaria*, 663 F. App'x at 388.

(Doc. 31, at 24–26.)

It was not the Court's intention to dismiss AMM's Equal Protection, Establishment, Free Exercise, and Free Speech claims to the extent they pled facial challenges (or to otherwise dismiss those claims in part), though the Court understands how Defendants could have construed the above passage as implying such a division. Nonetheless, having established the evidence in support of AMM's standing, the Court will now clarify the scope of that standing

---

[7] AMM does not allege, for instance, that it has suffered harm because it is uncertain of whether its services constitute "online ordinations" (on the contrary, its allegations suggest a considerable confidence that providing its services in Tennessee would indeed violate the statute on its face, which is why it seeks injunctive relief mirroring the assurances of the ULCM Stipulations). (*See generally* Doc. 19.)

[8] Note also that AMM's due process and unconstitutional-conditions claims resemble closely those in the *ULCM* complaint. (*See* 2:19-cv-49 (M.D. Tenn.), Doc. 80, at 17–18, 20.) Given that ULCM alleged (and the Sixth Circuit found) it had associational standing, but that AMM alleges only organizational standing, it is perhaps unsurprising that AMM's complaint falls short of showing these alleged violations are traceable to its *organizational* injury. *See ULCM,* 35 F.4th at 1036.

and, accordingly, the capacities in which AMM's claims may proceed to the merits. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (noting that a plaintiff must have standing for "each claim it seeks to press").

The Court presumes Defendants construed the above passage as dismissing "AMM's facial claims" primarily in response to its discussion of AMM's vagueness claim—a doctrine which, as the Court noted, "generally suggests a problem with statutory language." (Doc. 31, at 25.) In dismissing the vagueness claim, the Court relied not on a distinction between facial and as-applied claims, but on a distinction between claims that are based on statutory text and those that are based on official conduct. (*See id.*) Now, with the benefit of the summary judgment record, the Court finds it clearer yet that this distinction—between statutory text and official conduct—best accounts for the limited scope of AMM's standing in this litigation: AMM does not have standing to bring claims contending the statutory text of the Online Ordination Ban is unconstitutional (either facially *or* as applied); but it does have standing to bring claims contending Defendants' conduct with regard to the Online Ordination Ban, insofar as that conduct impacts AMM, is unconstitutional.

The division between facial and as-applied claims is more helpful for conceptualizing some types of constitutional claims than others. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 ("The distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."). Claims that tend to be more readily categorized as either facial or as-applied, such as many Equal Protection claims, are often

grounded in statutory text either way.[9]  Particularly relevant here, the facial-or-as-applied

distinction can be a less natural fit for claims brought under the religion clauses.  For instance, in

*Kennedy v. Bremerton School District*, a high-school football coach contended his school district

violated his Free Exercise rights when it disciplined him for praying at football games.  *See* 597

U.S. 507, 514–18 (2022).  The *Kennedy* court did not categorize this claim along facial-or-as-

applied lines, and it would be difficult to do so given that Kennedy challenged official conduct,

in the form of the district's disciplinary actions, rather than the enforcement of any particular

statutory or regulatory text.  *See generally id.*

Here, when the Court dismissed the vagueness claim, it did so because that claim was

cognizable exclusively as a challenge to the statutory text of the Online Ordination Ban.  (*See*

Doc. 31, at 25–26.)  In contrast, the claims for which the Court found AMM had alleged

standing—Equal Protection, Establishment, Free Exercise, and Free Speech—were all

potentially cognizable as challenges to Defendants' conduct (separate and apart from the

statutory text[10]).  (*See* Doc. 31, at 24–26.)  What matters for summary-judgment purposes, then,

is (a) in what capacities AMM has ultimately pressed those claims and (b) whether those

capacities are consistent with the standing it has ultimately established, which supports

challenges to Defendants' official conduct in relation to the statute.  Therefore, to the extent

AMM now seeks to press claims challenging the statutory text—which includes its facial

---

[9] A typical as-applied Equal Protection claim, that is, says something like, "this *statutory classification* is unconstitutional as applied to me."  *See e.g.*, *Lehr v. Robertson*, 463 U.S. 248, 267 (1983) (explaining that statutes differentiating between the parental rights of non-marital mothers and fathers "may not constitutionally be applied" to non-marital fathers under the Equal Protection Clause).

[10] As the Court has explained, and as the record reflects, there is no basis on which Defendants can be said to have affirmatively enforced the statutory text of the Online Ordination Ban against AMM.

challenges under the Equal Protection, Establishment, and Free Exercises Clauses—Defendants are entitled to summary judgment for lack of standing.[11]  This holding leaves two claims that challenge Defendants' treatment of AMM as compared to ULCM:  a claim under the Establishment Clause and an Equal Protection claim.  While AMM *could* have pressed a Free Exercise claim that, like the claim in *Kennedy*, was grounded in Defendants' official conduct rather than the statute, it is clear from AMM's briefing that it has not done so.  *See* 597 U.S. at 514–18; (Doc. 50, at 12–17; Doc. 52, at 9–13.)[12]  Neither of AMM's remaining claims (as the Court's merits analysis will illustrate) falls clearly along facial-or-as applied lines, though they do more closely resemble as-applied claims insofar as they would warrant remedies that are *narrower* in scope[13]; if AMM prevails on the merits, that is, the scope of AMM's standing would not justify the Court issuing a remedy as to the constitutionality of the statute generally.  *See Citizens United*, 558 U.S. at 331 (noting the distinction between facial and as-applied claims, while not always clear, is nonetheless "instructive and necessary, for it goes to the breadth of the remedy employed by the Court").

---

[11] AMM argues in its reply brief that its standing must include standing to challenge the facial constitutionality of the Online Ordination Ban under the "overbreadth doctrine," which in certain circumstances provides that a plaintiff who has standing to challenge a statute as applied also has standing to challenge the statute's facial constitutionality "to vindicate the rights of others not before the court . . . ."  *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 350 (6th Cir. 2007) (citations omitted); (*see* Doc. 54, at 2).  However, it is clear from *Prime Media*, and the other cases AMM cites in support of this doctrine, that it specific to Free Speech claims.  *See* 485 F.3d at 349–50.  As the Court will explain, AMM has abandoned any Free Speech claim; it therefore cannot rely on the overbreadth doctrine to enlarge its standing.

[12] AMM's arguments in support of its Free Exercise claim are concerned unmistakably with the statutory text of the Online Ordination Ban.  (*See* Doc. 50, at 12–17; Doc. 52, at 9–13.)  The Court offers no comment here on whether such a claim might have been likely to succeed on the merits.

[13] In this way, it makes sense that AMM's briefing characterizes both cognizable claims as as-applied challenges.

### B.     Sovereign Immunity

Defendants contend AMM's claims are barred by the doctrine of sovereign immunity. (*See* Doc. 48, at 11–12.)  The Court has already found, in its order on Defendants' motion to dismiss, that sovereign immunity does not bar the federal constitutional claims on which AMM has standing, and it incorporates that analysis here by reference.  (Doc. 31, at 26–28.)  It is not clear that the Court need address sovereign immunity again here.[14]  Nonetheless, for avoidance of doubt, the Court will address one argument Defendants make here that was not raised at the motion-to-dismiss stage:  they contend granting relief to AMM would require the Court to exceed its jurisdictional powers under the *Ex parte Young* exception to sovereign immunity.  *See* 209 U.S. 123 (1908); (Doc. 48, at 11–12).

Under *Ex parte Young*, "the Eleventh Amendment does not bar a lawsuit seeking an injunction against a state official prohibiting the state official from enforcing a state statute that allegedly violates the United States Constitution" or otherwise violating federal law.  *Dubuc v. Mich. Bd. of L. Exam'rs*, 342 F.3d 610, 616 (6th Cir. 2003).  The rationale for this exception is that when a state official violates federal law, he is considered to be acting outside of his official authority:  "when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011).  To determine whether *Ex parte Young* applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'"

---

[14] Sovereign immunity is a question of law.  *See S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008).  Unlike standing, for which different standards apply at the motion-to-dismiss and summary-judgment stages, *see Lujan*, 504 U.S. at 561, it is not clear why an objection to jurisdiction on sovereign-immunity grounds should warrant reexamination on summary judgment.

*Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)).

Defendants argue *Ex parte Young* would not permit entry of an injunction requiring them to extend the ULCM Stipulations to AMM; on this much the Court agrees. (*See* Doc. 48, at 11.) Entering into the ULCM Stipulations was an affirmative act, and requiring Defendants to make the same promises they made in those stipulations to AMM would go impermissibly beyond "command[ing Defendants to] refrain from violating federal law." *Va. Off. for Prot. & Advoc.*, 563 U.S. at 255. However, this does not mean the Court is unable to fashion relief that would address AMM's claims without compelling Defendants to engage in affirmative conduct. For instance, the Court could issue an injunction enjoining Defendants "from engaging in disparate treatment of AMM as compared to ULCM with respect to the Online Ordination Ban." Such relief would provide redress for AMM's pecuniary and reputational injury, and it would not require Defendants to engage in any affirmative conduct in violation of *Ex parte Young*. *See Dubuc*, 342 F.3d at 616.[15] Therefore, sovereign immunity does not bar AMM's claims.

---

[15] Defendants also argue the Court cannot issue an injunction enjoining them from enforcing the Online Ordination Ban against AMM, citing a Sixth Circuit rule that the *Ex parte Young* exception "does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute." *EMW Women's Surgical Center, P.S.C. v. Beshear*, 920 F.3d 421, 445 (6th Cir. 2019) (quoting *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415 (6th Cir. 1996)) (internal quotations omitted); (*see* Doc. 48, at 11–12). But the injunction described above would not enjoin Defendants from enforcing the statute against AMM—indeed, if anything were to change in ULCM's status with respect to the Online Ordination Ban, nothing in this injunction would bar Defendants from enforcing the statute against both organizations. Furthermore, as the Court has explained with respect to standing, this suit is about Defendants' conduct in relation to the statute, not the constitutionality of the statute itself.

C.      State Action

AMM brings its claims under 42 U.S.C. § 1983, which means it must show "(1) that [it] was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014) (citations omitted).

Defendants contend they were not "acting under color of law" under § 1983 because "[t]he only 'state action' AMM has established is *inaction*—the failure to expressly disclaim an intent to challenge the validity of weddings officiated by AMM ministers." (Doc. 48, at 12–13 (emphasis in original).)  The Court is not convinced by this argument.  In the first place, the act of entering into the ULCM Stipulations was state action.  It was an affirmative act, as Defendants' argument on sovereign immunity acknowledges (*see* Doc. 48, at 11), and it was undertaken in their official capacity as Tennessee district attorneys.  (*See* Doc. 49-1, at 349).  Defendants have cited no authority (and the Court's research has not revealed any) that would suggest they were not "acting under color of law" when they engaged in this affirmative, official-capacity conduct.  *See Robertson*, 753 F.3d at 614.  At minimum, then, the ULCM Stipulations themselves constitute state action.  Still, the Court appreciates that Defendants' post-stipulations conduct presents a somewhat more difficult question.  *See Koulta v. Merciez*, 477 F.3d 442, 445–46 (6th Cir. 2007) (explaining that "it is sometimes difficult to distinguish action from inaction").

Litigation on the boundaries between action and inaction for state-action purposes has often developed through cases where plaintiffs seek to hold state actors liable for failing to intervene to stop "private acts of violence."  *See Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006).  This line of jurisprudence traces back to the Supreme Court's holding in *DeShaney v. Winnebago County Department of Social Services* that the Due Process Clause does not

24

"require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. 189, 195 (1989); *see Jones*, 438 F.3d at 689–90 (explaining how this holding has shaped the limits of the state-action doctrine, including two exceptions recognized by the Supreme Court and the Sixth Circuit in which a state actor's failure to intervene can constitute state action). As the *Jones* court notes, the Supreme Court and the Sixth Circuit have recognized two exceptions to *DeShaney* in which a state actor's failure to intervene can constitute state action: (1) cases involving "incarceration, institutionalization, or other similar restraint of personal liberty"; and (2) the state-created-danger doctrine. *See* 438 F.3d at 690 (citing *DeShaney*, 489 U.S. at 199–200; *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)).

The Court does not find *DeShaney* and its progeny very helpful here given the extent to which this development has been rooted in the context of private acts of physical violence or harm. *See, e.g.*, *Koulta*, 477 F.3d at 445–46 ("Rather than focusing on the often-metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on *whether [the victim] was safer* before the state action than he was after it." (citation omitted; emphasis added)). It is unclear how the private-violence context of these cases might be analogized to either the online-ordination context generally or AMM's pecuniary and reputational injury specifically. Nonetheless, the Court is skeptical of the proposition that Defendants' post-stipulation conduct amounted to no more than inaction—particularly when it followed what was certainly affirmative state action in entering the ULCM Stipulations. (*See* Doc. 48, at 12–13.) The record supports an inference that, having been informed of the impact of the ULCM Stipulations on AMM no later than approximately one month after their entry, Defendants took at least some action: having received AMM's September 19, 2023, letter,

Defendants evidently *made a decision* to withhold any form of assurance of equal treatment from AMM. (*See* Doc. 49-1, at 13–14, 198–202.) Given that Defendants had just recently extended the ULCM Stipulations, it is fair to construe their decision to withhold similar assurances from AMM as an affirmative act—or, at least, a continuation of a course of state action already begun.

Ultimately, the Court need not make a final decision on the state-action status of Defendants' post-stipulation conduct, because it will find in their favor on the merits regardless. For purposes of the remainder of this opinion, then, the Court assumes AMM has satisfied the state-action requirement.

### D.    Establishment

"'The clearest command of the Establishment Clause' is that the government may not 'officially prefer' one religious denomination over another." *Catholic Charities Bureau, Inc. v. Wis. Labor & Indus. Review. Comm'n*, 605 U.S. 238, 247 (2025) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)) (internal alteration omitted). Establishment Clause jurisprudence has undergone significant evolution in recent years, particularly with respect to how courts should evaluate claims alleging an official establishment of religious over secular activity. *See Kennedy*, 597 U.S. at 534–36.[16] Yet when a plaintiff contends the government prefers one religious denomination or activity over another, as is the case here, the relevant law is clear:

---

[16] *Kennedy* explains that the Court "long ago abandoned" the tripartite test for evaluating claims that the government impermissibly elevates religious over secular activity that was first articulated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See* 597 U.S. at 534. "In place of *Lemon* and the endorsement test," the *Kennedy* majority writes, "this Court has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Id.* at 535 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2013)). For additional analysis of this evolving jurisprudence, see also *Smith v. Jefferson Cnty. Bd. of School Comm'rs*, 788 F.3d 580, 596–602 (6th Cir. 2015) (J. Batchelder concurring) (examining in depth the Supreme Court's evolving Establishment jurisprudence as of 2015, including its "varied" application of the *Lemon* test).

"[The Establishment Clause] principle of denominational neutrality bars States from passing laws that aid or oppose particular religions, or interfere in the competition between sects." *Catholic Charities*, 605 U.S. at 247–48 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968); *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)) (internal quotations omitted). "When a state law establishes a denominational preference, courts must 'treat the law as suspect' and apply 'strict scrutiny in adjudging its constitutionality.'" *Id.* at 248 (quoting *Larson*, 456 U.S. at 246).

Here, AMM contends Defendants have violated the Establishment Clause by "set[ting] up favored and disfavored religious institutions under the law" and impermissibly "ma[de] accommodations for some religious denominations and not others." (Doc. 50, at 22.) However, AMM does not cite any evidence from the record that would indicate a denominational difference between it and ULCM, nor does it otherwise explain how Defendants' disparate treatment of AMM and ULCM constitutes denominational discrimination sufficient to show an Establishment Clause violation. (*See* Doc. 50, at 22–24; Doc. 52, at 13–15; Doc. 54, at 4–6.) The absence of such evidence of a denominational difference alone is sufficient to grant summary judgment to Defendants.[17] *See Celotex*, 477 U.S. at 325.

Nor does AMM cite any authority to support the proposition that, in the absence of a showing of denominational discrimination, an official preference among different "religious *institutions*" violates the Establishment Clause. (Doc. 50, at 22 (emphasis added).) AMM does cite *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994), in which it contends "the Supreme Court held that the State of New York had violated the Establishment Clause when one religious group was benefitted by receiving a school district of

---

[17] If anything, there is evidence in the record that might suggest a *lack* of denominational discrimination—namely, as Defendants point out, that AMM stated in its Complaint that "the difference between AMM and ULCM is not based on faith." (Doc. 49-1, at 114.)

its own because there was 'no assurance that the next similarly situated group' would receive the same benefit." (Doc. 50, at 23 (citing 512 U.S. at 703–04).) However, *Kiryas Joel* presented an unusual set of facts in which the village of Kiryas Joel was "a religious enclave of Satmar Hasidim, practitioners of a strict form of Judaism," such that "the village remained exclusively Satmar" when the legislature enacted the disputed statute that created a separate Kiryas Joel school district. 512 U.S. at 690, 699. Given these factual circumstances, this Court interprets the *Kiryas Joel* Court's reasoning regarding the lack of "assurance that the next similarly situated group seeking a school district of its own will receive one" as implying that a similarly situated *but denominationally distinct* religious group might not have received the same special treatment. *See* 512 U.S. at 703–04. As the majority explains directly following the sentence AMM cites;

> Nor can the historical context in these cases, furnish us with any reason to suppose that the Satmars are merely one in a series of communities receiving the benefit of special school district laws. Early on in the development of public education in New York, the State rejected highly localized school districts for New York City when they were promoted as a way to allow separate schooling for Roman Catholic children.

*Id.* (citation omitted). *See also id.* at 716–17 (J. O'Connor, concurring in part) ("I join Parts . . . of the Court's opinion because I think this law, rather than being a general accommodation, singles out a particular religious group for favorable treatment. . . . it seems proper to treat it as a legislatively drawn religious classification."). Thus, *Kiryas Joel* cannot support a finding that Defendants' disparate treatment of AMM and ULCM violates the Establishment Clause. *See id.* at 703–04.

For these reasons, Defendants are entitled to summary judgment on AMM's Establishment Clause claim.

### E.    Free Speech

A plaintiff who fails to address a claim in response to a motion for summary judgment abandons the claim.  *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear:  a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that "[t]he district court properly declined to consider the merits of [the plaintiff's hostile work environment claim] because [the plaintiff] failed to address it in . . . his response to the summary judgment motion").

Here, Defendants moved for summary judgment on AMM's Free Speech claim, and AMM failed to address that claim in its response.  (*See* Doc. 48, at 18–21.)  On top of that, AMM's brief in support of its own motion for summary judgment makes no mention of Free Speech.  (*See* Doc. 50.)  Because these facts demonstrate plain abandonment, Defendants are entitled to summary judgment on AMM's Free Speech claim.  *See Brown*, 545 F. App'x at 372.

### F.    Free Exercise

As the Court explained in its standing analysis, AMM lacks standing to bring the claim it now seeks to press under the Free Exercise Clause because that claim contests the constitutionality of the text of the Online Ordination Ban rather than Defendants' disparate treatment of ULCM and AMM.  (*See supra* at 19–21.)

To the extent AMM might have brought a Free Exercise claim challenging Defendants' conduct that would have been consistent with the scope of its standing, AMM has abandoned that claim.  *See Brown*, 545 F. App'x at 372.  In Defendants' brief in support of their motion for summary judgment, they state, "[a]s a prefatory matter, AMM has not brought an as-applied

claim challenging Defendants' conduct under the Free Exercise Clause," citing to the relevant count of AMM's complaint. (Doc. 48, at 17.) Although the Court is skeptical of whether this is a necessary construction of AMM's complaint, Defendants go on to argue that "[i]n any event, [their] alleged 'disparate enforcement' of the online-ordination provision does not violate AMM's free-exercise rights." (*Id.*) Most importantly for present purposes, AMM's response brief neither (a) disputes Defendant's limiting construction of its complaint nor (b) makes any argument to the effect that Defendants' disparate treatment of AMM as compared to ULCM violates the Free Exercise Clause. (*See* Doc. 52.) Therefore, Defendants are also entitled to summary judgment on AMM's Free Exercise claim. *See Brown*, 545 F. App'x at 372.

### G.    Equal Protection

A plaintiff bringing a claim under the Equal Protection Clause has three general paths to relief: "The Fourteenth Amendment's guarantee of the 'equal protection of the laws' bars governmental discrimination that either (1) burdens a fundamental right, (2) targets a suspect class, or (3) intentionally treats one differently from others similarly situated without any rational basis for the difference." *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023) (citing *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 788 (6th Cir. 2005)). Heightened scrutiny applies to an Equal Protection claim when the challenged conduct classifies based on a suspect class or burdens a fundamental right, including "where the classification . . . is based on religion or burdens the exercise of religion." *Bowman v. United States*, 564 F.3d 765, 772 (6th Cir. 2008) (citing *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)). To show that official action burdens a fundamental right, a plaintiff must make the same showing that would be required to establish a violation of that right. *See Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) ("Davey also argues that the Equal Protection Clause protects against discrimination on the basis of

religion.  Because we hold . . . that the program is not a violation of the Free Exercise Clause,

however, we apply rational-basis scrutiny to his equal protection claims.") (citing *Johnson v.*

*Robison*, 415 U.S. 361, 375, n. 14 (1974); *McDaniel v. Paty*, 435 U.S. 618 (1978)).

### i.        *Whether Heightened Scrutiny Applies*

AMM argues strict scrutiny applies here because "Defendants are treating AMM

disparately from other religious organizations" and, as a result, have burdened its "fundamental

right to exercise [its] religious beliefs."  (Doc. 50, at 20; Doc. 52, at 19.)  But AMM's arguments

for strict scrutiny fall short.  The record does not support a finding that Defendants' disparate

treatment of AMM and ULCM is based on religion, because—just as there was no

denominational difference to support an Establishment Clause violation—AMM has not pointed

to any relevant religion-based distinction between the two organizations that could support a

finding of "classification . . . based on religion."[18]  *Bowman*, 564 F.3d 772.  AMM also has not

established that Defendants' conduct burdens a fundamental right, as it has not shown that

Defendants have violated its religious rights under the First Amendment.  *See Locke*, 540 U.S. at

720 n.3.  Finally, while AMM suggests the Online Ordination Ban violates additional

fundamental rights "including . . . the rights of couples to make significant decisions about their

entry into marriage," its organizational standing does not extend to the fundamental rights of

---

[18] Even if AMM had established a religion-based difference between the two organizations,
furthermore, that would likely be a necessary but insufficient condition to trigger strict
scrutiny—because AMM would also need to show that Defendants' conduct was *based* on its
religion as opposed to ULCM's religion.

Additionally, the mere fact that AMM and ULCM are two separate religious organizations
cannot be enough to show classification based on religion.  Imagine, for instance, if AMM and
ULCM were two traditional, brick-and-mortar churches, housed in separate facilities but with
indistinguishable religious beliefs and practices; were state officials to nonetheless treat them
differently, it would not make sense to call this a classification based on religion merely because
they were two different religious organizations.

31

couples.  (Doc. 50, at 20.)  Therefore, AMM's Equal Protection claim does not warrant strict scrutiny.

### ii.        The Class-of-One Framework

Accordingly, AMM's claim must be evaluated under rational basis review as a "class-of-one" Equal Protection claim.  *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (holding that class-of-one claims are cognizable under the Equal Protection Clause).  These claims are grounded in an as-applied framework and scope (even if they do not pertain specifically to application of a statute), in the sense that they allege unequal treatment of the plaintiff individually.  *See id.*  To prevail on a class-of-one claim, a plaintiff must show that "(1) 'she has been intentionally treated differently from others similarly situated'; and (2) 'there is no rational basis for the difference in treatment.'"  *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (quoting *Village of Willowbrook*, 528 U.S. at 564).  "Similarly situated is a term of art," generally requiring that the plaintiff and the party in comparison to whom she is alleging disparate treatment are alike in "all relevant respects" given the nature of the Equal Protection claim at hand.  *Paterek v. Village of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (citing *Green*, 654 F.3d at 651) (internal quotations omitted).  Provided the similarly-situated element is satisfied, the plaintiff then must show there is no rational basis for the disparate treatment in one of two ways:  "(1) showing pure arbitrariness by negativing every conceivable basis that might support the government's decision; or (2) showing an illegitimate motive such as animus or ill will."  *Green*, 654 F.3d at 652 (citation omitted).

### iii.        Prosecutorial Discretion

Before applying this framework to AMM's claim, the Court must address a specific argument Defendants make that may inform the scope of class-of-one review:  Defendants

contend that to the extent they did treat AMM and ULCM differently, that conduct was within their prosecutorial discretion. (*See* Doc. 48, at 15.) There is currently some ambiguity in the law regarding how courts should analyze class-of-one claims when the government action was an exercise of prosecutorial discretion. *See Green*, 654 F.3d at 652. In *Engquist v. Oregon Department of Agriculture*, the Supreme Court ruled that class-of-one claims are not cognizable in the context of public employment, because employment decisions about individual government employees involve "the government acting 'as proprietor, to manage [its] internal operation'" and are thus unfit for rational basis review. 553 U.S. 591, 598 (2008) (citation omitted).[19] Certain portions of the *Engquist* court's reasoning can be construed to suggest its holding of nonreviewability should apply to additional "forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id.* at 603 (analogizing to a traffic officer's exercise of discretion in issuing speeding tickets). The Seventh Circuit has extended *Engquist* to prosecutorial discretion, holding that a class-of-one claim that challenges an exercise of prosecutorial discretion "cannot be successfully challenged merely on the ground that it is irrational or arbitrary," leaving it unreviewable in the absence of a showing of improper motive or animus. *United States v. Moore*, 543 F.3d 891, 900–01 (7th Cir. 2008) (citing *Engquist*, 553 U.S. at 605) ("a class-of-one equal protection challenge, at least where premised solely on arbitrariness/irrationality, is just as much a 'poor fit' in the prosecutorial discretion context as in the public employment context"). The Sixth Circuit, however, has found it "unclear" whether *Engquist* applies to prosecutorial discretion and even expressed some skepticism regarding such an extension. *See Green*, 654

---

[19] The *Engquist* court's holding does not apply to employment discrimination claims based on protected characteristics. *See* 553 U.S. at 595.

F.3d at 652 ("It is unclear whether arbitrariness is a permissible basis on which to challenge a prosecutorial charging decision."); *Fakhoury v. O'Reilly*, 837 F. App'x 333, 339 (6th Cir. 2020) (not reaching defendants' argument that "after *Engquist* . . . class-of-one claims are not cognizable for challenges to state actions that are 'inherently subjective and discretionary'"); *Franks v. Rubitschun*, 312 F. App'x 764, 766 n.3 (6th Cir. 2009) ("[*Engquist*'s] reliance on the 'crucial difference' between government acting as sovereign and government acting as employer . . . suggests that *Engquist*'s discussion of discretionary decisionmaking should not control the case at hand.").  The Court need not decide this issue here, because (1) it does not believe Defendants' conduct was within their prosecutorial discretion; and (2) even assuming the opposite is true, it will find AMM cannot prevail on its class-of-one claim based on either arbitrariness or improper motive.[20]

Prosecutorial discretion traditionally includes charging decisions in a criminal case:  "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."  *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)*; see also United States v. Batchelder*, 442 U.S. 114, 124 (1979) ("Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion.").  Such decisions are often considered unreviewable because:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall

---

[20] The same was true in *Green*, where (although the conduct at issue there was prosecutorial discretion) the Sixth Circuit found Green could not prevail even assuming both routes to class-of-one liability were available:  "However, even if arbitrariness is a permissible basis on which to challenge a prosecutorial charging decision, Green does not show pure arbitrariness."  654 F.3d at 652.

enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.

*Wayte v. United States*, 470 U.S. 598, 607 (1985). Still, even within the realm of charging decisions, "although prosecutorial discretion is broad, it is not unfettered. Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints." *Id.* at 608 (citation and internal quotations omitted).

The Court is not convinced Defendants' conduct—either their entry into the ULCM Stipulations or their subsequent withholding of similar assurances to AMM—falls within their prosecutorial discretion. To begin, at risk of stating the obvious, the Online Ordination Ban is a civil statute; it appears in a civil section of the Tennessee Code, as part of a statute that regulates civil conduct, and it makes no mention of criminal enforcement or penalties. *See* Tenn. Code Ann. § 36-3-301(a)(2). When Defendants entered into the ULCM Stipulations, they expressed their position that the Online Ordination Ban cannot be enforced through criminal prosecution, including through the false-statement statute. (*See* Doc. 49-1, at 349.) Moreover, the record before the Court reflects that—to this day—"it *has always* been their position that there is no criminal prosecution mechanism in [the Online Ordination Ban]," and likewise, that "by simply making the attestation required . . . [ministers] are not making a false statement and thus there is no prosecutable offense under Tenn. Code Ann. § 39-16-504." (*Id.* (emphasis added).) There is no evidence that Defendants have ever waivered from this position; rather, they have expressed it affirmatively in their briefings on both the motion to dismiss and the instant motion for summary judgment. (*See* Doc. 21, at 7; Doc. 51, at 5.) In Jones's deposition, furthermore, he stated, "my examination of the law leads me to believe that there is no method of enforcement . . . I can't

35

prosecute anybody," and explained at length why he came to this conclusion.[21] (*See* Doc. 49-1, at 222–26.) Thus, no reasonable jury could find anything but this: Defendants believe, and have believed consistently, that the Online Ordination Ban is categorically unenforceable through criminal prosecution, including by means of the false-statement statute.

That Defendants have been so steadfast in this position informs the Court's disinclination to construe their conduct as prosecutorial discretion, in a few ways. First, the basic premise of prosecutorial discretion—that a prosecutor has discretion as to whether, and what to charge— assumes that a prosecutor *has the authority to bring charges* if she chooses to do so. *See e.g.*, *In re Wild*, 994 F.3d 1244, 1260 (11th Cir. 2021) ("The core of prosecutorial discretion, though— its essence—is the decision whether or not to charge an individual with a criminal offense in the first place."). Thus, it cannot be said that entering the ULCM Stipulations amounted to a decision not to charge, because Defendants entered into those stipulations believing they could not prosecute ULCM ministers even if they tried.[22] (*See* Doc. 49-1, at 349.) Where there is no authority for a prosecutor to enforce a statute, there is no discretionary decision for the prosecutor to make; the decision (insofar as there is one) has already been made by the legislature. And if promising not to prosecute ULCM ministers in the ULCM Stipulations was not an exercise of prosecutorial discretion, withholding similar promises from AMM was not one

---

[21] In the same deposition, as AMM points out (*see* Doc. 50, at 9), Jones admitted that the ULCM Stipulations are binding only as to ULCM, such that the stipulations would not in themselves prevent criminal prosecution of AMM ministers—but, more importantly here, he maintains that he lacks the authority to prosecute any minister *regardless* of the ULCM-specific scope of the stipulations: "Narrowing it down to a discussion merely of this stipulation and not a discussion of law as it stands, there is nothing contained solely within this stipulation that would prevent me from prosecuting AMM ministers." (Doc. 49-1, at 228.)

[22] Defendants cite no authority (and the Court knows of none) to support the proposition that a prosecutor's commitment not to enforce a civil statute that she does not believe is criminally enforceable constitutes prosecutorial discretion.

either.  Second, this context renders Defendants' conduct plainly distinct from the *Engquist* court's focus on "subjective, individualized assessments," in that their position that the Online Ordination Ban lacks a criminal enforcement mechanism is the opposite of subjective or individualized—it is a categorical assessment that would apply equally to any and all persons who violate the statue.  *See* 553 U.S. at 603.  Third, there is an equitable problem here:  given the position Defendants have taken and maintained for multiple years, where they have effectively *disclaimed* any prosecutorial authority they might have had, the proposition that they can now invoke their prosecutorial discretion as a shield is dubious at best.  For these reasons, the Court concludes Defendants' conduct was not an exercise of prosecutorial discretion.

### iv.        The Merits of AMM's Class-of-One Claim

AMM and ULCM are similarly situated.  Both are religious organizations, with no apparent denominational distinctions, who ordain ministers online in accordance with their ministry.  *See ULCM,* 35 F.4th at 1026; (Doc. 49-1, at 464–65).  Most importantly given the nature of AMM's claim here, they are competitors for the same customers—ministers and prospective ministers seeking to officiate weddings in Tennessee—and they have both sought to continue offering online-ordination services to these customers notwithstanding the Online Ordination Ban.

However, AMM cannot meet its burden of "showing pure arbitrariness by negativing every conceivable basis that might support the government's decision."[23]  *Green*, 654 F.3d at 652.  This is an extremely difficult burden for a plaintiff to satisfy, even in the already-deferential realm of rational basis review.  *See Shavers v. Almont Township, Mich.*, 832 F. App'x

---

[23] Given that AMM does not contend Defendants acted out of improper motive or animus, its only available path is to show pure arbitrariness.  *See Green,* 654 F.3d at 652.

933, 938 (6th Cir. 2020) ("But under the low standard that is rational basis review, the government has no obligation to produce evidence to sustain the rationality of its action; its choice is presumptively valid and may be based on rational speculation unsupported by evidence or empirical data." (citation and internal quotations omitted)). There was a rational basis for Defendants to enter into the ULCM Stipulations: they had a lawsuit to resolve, and the stipulations did just that. *See ULCM*, 35 F.4th 1021. That act may have had unintended or unforeseen consequences as to AMM (Wamp stated in deposition that, at the time she agreed to the ULCM Stipulations, she was not aware any other organization was offering online-ordination services in Tennessee), but that does not matter under rational basis scrutiny. *See Green*, 654 F.3d at 652; (Doc. 49-1, at 199).

Whether Defendants had a rational basis for withholding similar assurances or treatment from AMM following the ULCM Stipulations presents a closer question. At deposition, Wamp indicated she believed that Stipulation 4, which provides that "Defendants also stipulate and represent that it has always been their position that they are not involved with the issue of whether any marriage is valid and Defendants will not challenge the validity of marriages officiated or solemnized by ULCM ministers," applies to AMM as well as ULCM. (*See* Doc. 49-1, at 198, 349.) When counsel for AMM sought clarification, this exchange ensued:

> A: Do I agree that the same stipulation would apply to another organization, whether it's AMM or another one, that . . . gives online ordinations? Yes. But this agreement was only with ULC because the lawsuit was between ULC and the defendants.
>
> Q: Got it. Okay. So you—
>
> A: It really just only applies to ULC.
>
> Q: Would [you] be willing to recognize a stipulation that basically had the same language of paragraph 4 but substitut[ing] in AMM ministers for ULC ministers?

A:    Yes.

(Doc. 49-1, at 200.)  Whereas the class-of-one standard for arbitrariness generally assumes the difficult task of proving a negative (in that the plaintiff must "negat[e] every conceivable basis that might support the government's decision," *Green*, 654 F.3d at 652), this testimony provides meaningful, affirmative evidence of arbitrariness.  (*See* Doc. 49-1, at 200.)  Simply put, if a prosecutor is willing to recognize an identical stipulation for AMM, that suggests she has no rational basis not to do so.

The problem here for AMM, though, is that even a showing of some affirmative evidence suggesting arbitrariness is not enough to survive summary judgment if it cannot dispel "every conceivable basis that might support" Defendants' conduct.  *Green*, 654 F.3d at 652.  There is at least one conceivable rational basis for Defendants' disparate treatment of AMM following the ULCM Stipulations, and it has to do—somewhat ironically here—with the limits of their prosecutorial powers.  By their own accounts, Defendants' entry into the ULCM Stipulations was a rather extraordinary official act, in the sense that they made a series of promises not to enforce a civil statute over which (according to their own views of the relevant law) they lacked any enforcement power.  Given this context, in which Defendants made promises about a subject matter and a statute outside of their authority, it is conceivable that they might choose to avoid further entanglements with the Online Ordination Ban.[24]  It is as if, having found themselves off the road, Defendants have since endeavored to stay in their lane; this is certainly a rational attitude for government officials to take towards their duties.

---

[24] Though Defendants have not articulated this rationale in their briefings, it is, at minimum, consistent with their long-professed position on the statute, which is more than is required for them to prevail on rational basis review.

Thus, Defendants are entitled to summary judgment on the Equal Protection claim.

## IV.        CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 49) is hereby

**DENIED**.  Defendants' motion for summary judgment (Doc. 47) is hereby **GRANTED**, and all

claims against Defendants are hereby **DISMISSED**.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**
